Tresa Faye CHERRY, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner, Social Security Administration, Defendant.

No. 03–CV–156–CL.

United States District Court,
N.D. Oklahoma.

Jan. 7, 2004.

Gayle Louise Troutman, Troutman & Troutman, PC, Tulsa, OK, for plaintiff.

Cathryn Dawn McClanahan, United States Attorney, Tulsa, OK, Eric B Tucker, Social Security Administration, General Counsel, Dallas, TX, for defendant.

### ORDER

CLEARY, United States Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g), plaintiff Tresa Faye Cherry ("Cherry") requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for supplemental security income benefits ("SSI benefits") under Title XVI, 42 U.S.C. § 1381 *et seq.* of the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Cherry appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Cherry was not disabled. For the reasons discussed below, the Court REVERSES the Commissioner's decision.

### Claimant's Background

Cherry was born on November 13, 1954, and was 47 years old at the time of the ALJ's decision. (R. 57, 382). She has a twelfth grade education. (R. 153). Cherry worked as a babysitter. (R. 385–86). She alleges an inability to work beginning March 13, 1999, due to obesity, diabetes mellitus with neuropathy, high blood pressure, migraine headaches, and back problems. (R. 128, 147). She also claims to suffer from foot ulcers and arthritis in the lumbar spine.

Cherry has a history of morbid obesity. She is 63 inches tall with an average weight of 290–300 pounds over the three years prior to the administrative hearing. (R. 382). Due to her diabetes mellitus, Cherry has been insulin dependent for many years and has developed peripheral neuropathy with numbness in her legs and feet, as well as a history of foot ulcers and polyuria. (R. 200–203, 209–211, 390–392, 410–411).

Cherry received treatment from Morton Comprehensive Health Services ("Morton") commencing March 18, 1999. (R. 10–20, 198, 301–19). On that date, a lumbar spine x-ray revealed grade I spondylolisthesis of L5/S1, mild to moderate disc space narrowing between L4–5, and mild degenerative and osteoporotic changes in both hips. (R. 190). On June 22, 1999, a MRI confirmed grade I spondylolosthesis and lateral bulging at L5/S1 with bilateral encroachment on the L5/S1 intervertebral foramen. (R. 198). Cherry received

treatment with steroids and anti-inflammatory drugs. (R. 184–89).

Cherry's physician at Morton, Larry Bowler, M.D., referred Cherry for evaluation to a neurosurgeon at University Hospital in Oklahoma City. (R. 253). In her August 16, 1999 letter to Dr. Bowler, neurosurgeon Mary Kay Gumerlock, M.D. confirmed Cherry's grade I L5–S1 spondylolisthesis and bilateral S1 radiculopathy and noted Cherry's extreme obesity, tender back, and peripheral neuropathy with decreased reflexes and sensation in both ankles and feet. (R. 295–96). Dr. Gumerlock determined that Cherry was not an "operative candidate" at that point and recommended that she be referred to a dietitian for weight loss and for physical therapy for her diabetic foot ulcers as well as an exercise training regimen. In addition, Dr. Gumerlock also recommended that Cherry see a pain management specialist and a urologist for her urinary incontinence. *Id.*

On August 3, 1999, Cherry underwent a consultative examination by Varsha Sikka, M.D., at the request of the Social Security Administration ("SSA"). Dr. Sikka diagnosed Cherrry with chronic degenerative disc disease of the lumbosacral spine, obesity, history of diabetic foot ulcers, possible peripheral poly-neuropathy and history of diabetes mellitus. (R. 209–214). Dr. Sikka noted the following in her examination: Cherry's range of motion in the lumbosacral spine was within normal limits although painful; she had grade II–III ulcers on her feet. (R. 211). Dr. Sikka also observed "decreased sensation in the stocking distribution," [1] and that Cherry's gait was wide-based and slow, though a

cane was unnecessary. She did not express an opinion as to Cherry's functional limitations.

From May 18, 1999 through March 26, 2002, Cherry received treatment from podiatrist Steven Smith, D.P.M. for neuropathy with foot pressure ulcers. (R. 200–03, 338). On October 24, 2000, Dr. Smith completed a Medical Source Statement opining that Cherry was unable to lift or carry more than 10 pounds, stand or walk more than two hours a day and was restricted in her lower extremities. (R. 298–300). Dr. Smith also stated that Cherry could kneel and crawl only occasionally and could never climb, balance or crouch. *Id.* He attributed these restrictions to her severe neuropathy with foot pressure ulcers.

Cherry also received regular chiropractic care from R. Brent Newcomb, D.C. from August 28, 1999 to January 24, 2000. (R. 215–39, 254). Dr. Newcomb observed that Cherry had very limited range of motion in her lumbar spine, restricted to 10% of normal. (R. 237). After extensive treatment, Cherry improved to 50% of normal. (R. 222). In his January 24, 2000 letter, Dr. Newcomb opined that Cherry's primary problem was low back pain which was complicated by spondylolisthesis, L5/S1 disc bulging, diabetes and obesity. (R. 215). He stated that her physical rehabilitation must be limited to non-weight bearing exercise "due to ulcers on her feet which will never allow her to stand or walk for extended periods," and that she should avoid lifting, carrying or handling objects greater than five pounds. *Id.*

---

**1.** In a Medical Consultant Review Form dated August 3, 1999, the consultant noted a discrepancy in Dr. Sikka's consultative examination report:

I started changing your RFC considerably but there is a conflict In CE. The narrative page 3 under neurological says there is a stocking loss of sensation which I suspect is correct. The CE and 3A says no loss of sensation. Cannot be both. Need to call CE for correction. (R. 204).

On September 16, 1999, a state disability medical consultant reviewed the record and determined Cherry had the residual functional capacity ("RFC") for sedentary work. This assessment was affirmed as written by another consultant on February 4, 2000. (R. 240–251).

On November 9, 2000, Dr. Bowler completed a Medical Source Statement of Ability to Do Work–Related Activities (Physical) opining that Cherry was unable to lift or carry more than ten pounds, could stand or walk less than two hours and sit less than six hours in an eight-hour day, and she was unable to climb, balance, kneel, crouch and crawl. (R. 302–304). Medical records from Dr. Bowler's examinations of Cherry through February 18, 2002 assess her conditions as chronic (though stable) musculoskeletal back pain from degenerative disc disease, obesity, insulin dependent diabetes mellitus and hypertension. (R. 326–337).

Although not before the ALJ for decision, the Appeals Council also considered Cherry's medical records from Morton for the period of February 18, 2002 to September 20, 2002 which reflected Dr. Bowler's continued diagnosis of chronic degenerative disc disease of the lumbar spine, obesity, hypertension and diabetes. (R. 6–20). Prior to July 5, 2002, Dr. Bowler characterized Cherry's degenerative disk disease as chronic and stable. (R. 13–16). In response to Cherry's complaint that her back pain had increased and that she was denied disability benefits based on the incorrect assumption that her condition was stable, Dr. Bowler scheduled another MRI on July 25, 2002 at Cherry's request. (R. 12–13). The July 29, 2002 MRI report provided the following diagnosis:

1. LIMITED STUDY DUE TO PATIENT BODY HABITUS.

2. GRADE II SPONDYLOLISTHESIS AT L5–S1 WITH BULGING DEGENERATED DISK. BILATERAL FORAMINAL STENOSIS WITH NEAR IMPINGEMENT OF THE BILATERAL L5 NERVE ROOTS. BECAUSE OF THE ANTERIOR SPONDYLOLISTHESIS, THE DURAL SAC AND S1 NERVE ROOTS ARE ALMOST COMPRESSED AGAINST THE SUPERIOR POSTERIOR MARGIN OF THE S1 SACRAL SEGMENT.

3. L2–3 DISK BULGING, EXAGGERATED LUMBAR LORDOSIS.

(R. 18). On August 22 and September 20, 2002, Dr. Bowler prescribed MS Contin for Cherry's back pain. (R. 10–11).

### Procedural History

On May 18, 1999, Cherry protectively applied for SSI benefits under Title XVI (42 U.S.C. § 1381 *et seq.*). (R.127). After a hearing on October 5, 2000, Administrative Law Judge Lantz McClain ("ALJ") denied her application for benefits on January 26, 2001. (R. 78–87, 339–75). On June 22, 2001, the Appeals Council remanded with instructions to obtain a medical source statement from Dr. Gumerlock as well as evidence from a "medical expert to clarify the nature and severity" of Cherry's impairments "to resolve the conflicts in the record regarding the claimant's ability to perform certain work-related functions," and to evaluate Cherry's obesity under SSR 00–3p to determine whether her "obesity considered alone or in combination with her other impairments is equivalent to a listed impairment and, if not, its impact on her ability to perform work-related activities on a sustained basis." (R. 115–18).

On remand, another hearing before Administrative Law Judge Lantz McClain was held on March 19, 2002. (R. 376–416). The ALJ introduced into the record a returned second request of Dr. Gumerlock to provide the SSA with an assessment of

Cherry's RFC which contained a subscribed note from a Dr. Robert Wienecke, advising the following:

> We have seen this patient in consultation only. We do not make social security statements. Jim Thorpe and Health South do make the evaluations via health care providers trained to do so.

(R. 320, 378–379). The ALJ also heard further testimony from Cherry, the SSA's medical consuitant, Harold Earl Goldman, M.D., and a vocational expert. (R. 121–127, 376–416). By decision dated June 18, 2002, the ALJ found that Cherry was not disabled at any time through the date of the decision. (R. 42–58).

On January 14, 2003, the Appeals Council denied review of the ALJ's findings. Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 416, 1481.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ...." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy ...." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 416.920.[2]

■ The role of the court in reviewing the decision of the Commissioner under 42 U.S.C. § 405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir.1996); *Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). The court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Casias v. Secretary of Health &*

---

**2.** Step One requires the claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 416.910. Step Two requires that the claimant establish that she has a medically severe impairment or combination of impairments that significantly limit her ability to do basic work activities. *See* 20 C.F.R. § 416.921. If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that she does not retain the residual functional capacity ("RFC") to perform her past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account her age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir.2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.

*Human Servs.*, 933 F.2d 799, 800 (10th Cir.1991). Even if the court would have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *Hamilton v. Secretary of Health & Human Servs.*, 961 F.2d 1495, 1498 (10th Cir.1992).

## Decision of the Administrative Law Judge

The ALJ made his decision at the fifth step of the sequential evaluation process. He found that Cherry had severe impairments of spondylolisthesis at L5–S1, obesity, hypertension and diabetes mellitus with numbness in the feet, but did not meet a listed impairment, specifically Listing 1.04 (pertaining to degenerative disc disease), Listing 9.08 (pertaining to diabetes mellitus) or Listing 4.03 in reference to hypertension. (R. 45–53). He found that Cherry had the residual functional capacity ("RFC") to stand and walk for at least 2 hours in an 8–hour work, sit 6 hours in an 8–hour workday, carry and lift 10 pounds frequently, bend and stoop frequently though unable to climb, and therefore, could perform a "wide range of sedentary work." (R. 53). In so finding, the ALJ relied on Dr. Goldman's opinion based on his review of Cherry's medical record, discounting Drs. Smith's and Bowler's assessment of Cherry's RFC. (R. 51–52). The ALJ determined that Cherry could not perform her past relevant work, but there were other jobs existing in significant numbers in the national and regional economies that she could perform, based on her RFC, age, education, and work experience, including an optical goods assembler or clerical mailer. (R.56–57). The ALJ thus concluded that Cherry was not disabled under the Social Security Act at any time through the date of the decision. (R. 53).

## Review

■ Cherry asserts as error that the ALJ (1) failed to evaluate this case under former obesity listing, Listing 9.09, which was in effect at the time of her application and (2) if Listing 9.09 does not apply, the ALJ failed to properly consider her obesity under the revised listings as directed by Social Security Ruling ("SSR") 00–3p and its replacement 02–1p, thereby undermining the ALJ's evaluation at Steps Three and Five and his evaluation of the treating source opinions.

As the Court concludes that the ALJ should have evaluated Cherry's impairments under former Listing 9.09 at Step Three, the Court remands the case for appropriate consideration.

### (A) The Rule Change

Under the Social Security Act, Congress has granted the SSA the following authority to implement the SSI program:

> The Commissioner of Social Security shall have the full power and authority to make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder.

42 U.S.C. §§ 405(a) and 1383(d)(1). Pursuant to this authority, the SSA has determined a listing of impairments in 20 CFR pt. 404, subpt. P, app. 1 which are presumed by the agency to be severe enough to support a finding of disability. 20 C.F.R. § 416.525(a). These listings are "descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system

they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." *Sullivan v. Zebley*, 493 U.S. 521, 529–30, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).

Prior to October 25, 1999, the SSA recognized obesity as a separate listing under Listing 9.09, which, if met or equaled, would presume a claimant's disability at Step Three of the evaluative process. Listing 9.09 provided in pertinent part that a claimant is impaired if she meets the following criteria:

9.09   **Obesity.** Weight equal to or greater than the values specified in Table I for males, Table II for females (100 percent above desired level) [3] and one of the following:

A) History of pain and limitation of motion in any weight-bearing joint or the lumbrosacral spine (on physical examination) associated with findings on medically acceptable imaging techniques of arthritis in the affected joint or lumbrosacral spine; or

B) Hypertension with diastolic blood pressure persistently in excess of 100 mm. Hg measured with appropriate size cuff; or

C) History of congestive heart failure manifested by past evidence of vascular congestion such as hepatomegaly, peripheral or pulmonary edema; or

D) Chronic venous insufficiency with superficial varicosities in a lower extremity with pain on weight bearing and persistent edema; or

E) Respiratory disease with total forced vital capacity equal to or less than 2.0 L. or a level of hypoxemia at rest equal to or less than the values specified in Table III–A or III–B or III–C.

20 C.F.R. pt. 404, subpt. P, app. 1, Listing 9.09.

Effective October 25, 1999, the SSA issued the Revised Medical Criteria for Determination of Disability, Endocrine System and Related Criteria, 64 Fed.Reg. 46122, 1999 WL 637689 (Aug. 24, 1999)(codified at 20 C.F.R. pt. 404, subpt. P, app.1)("Revised Medical Criteria") which deleted Listing 9.09 from the Listing of Impairments.[4] In the Revised Medical Criteria, the SSA explained that it was deleting Listing 9.09 because the criteria in the listing "did not represent a degree of functional limitation that would prevent

---

3.   The weight range corresponding to Cherry's recorded height of 63 inches set forth in Table II is 250 pounds. The administrative record reflects, and the Commissioner does not contest, that Cherry's weight exceeded this listing level during the applicable period.

4.   Although the final rule change deleted the separate listing for obesity in Listing 9.09, the SSA "added paragraphs to the prefaces of the musculoskeletal, respiratory, and cardiovascular body system listings that provide guidance about the potential effects obesity has in causing or contributing to impairments in those body systems." SSR 02–01p, 2000 WL 628049 at *1(September 12, 2002). *See* Revised Listing 1.00Q (musculoskeletal system), 3.00I (respiratory system) and 4.00F (cardiovascular system).

The revised listings added the following paragraph:

**Effects of obesity.**   Obesity is a medically determinable impairment that is often associated with disturbance of the [musculoskeletal, respiratory or cardiovascular] system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with [musculoskeletal, respiratory or cardiovascular] impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity. 20 C.F.R. pt. 404, subpt P. app. 1, Listings 1.00Q, 3.00I, and 4.00F.

an individual from engaging in any gainful activity." *Revised Medical Criteria,* 64 Fed.Reg. at 46122. The Revised Medical Criteria also stated that the "final rules have only a prospective effect." *Id.* The SSA noted that "[u]nless otherwise required to do so (for example, by statute), we do not readjudicate previously decided cases when we revise our listings." *Id.*

On May 15, 2000, the SSA issued Social Security Ruling ("SSR") 00–3p to "provide guidance on SSA policy concerning the evaluation of obesity in disability claims." SSR 00–3p, 2000 WL 33952015 at *1 (May 15, 2000)(*superceded by* SSR 02–1p, 2000 WL 628049 (September 12, 2002)). The Ruling reiterates that obesity had been deleted as a listed impairment, but must still be considered in evaluating a claimant's disability because obesity is a medically determinable impairment to be considered in combination with other impairments not only under the listings but "at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity." *Id.*

SSR 00–3p also explains that the "prospective" effect of the Revised Medical Criteria means that Listing 9.09 was no longer applicable to "claims that were filed before October 25, 1999, and that were awaiting an initial determination or that were pending appeal at any level of the administrative review process or that had been appealed to court." *Id.* at *7. The Ruling states that the rule change affects the "entire claim, including the period before October 25, 1999," as is the SSA's usual policy with regard to changes in listings, and emphasizes that the deletion did not apply to claimants already found eligible to receive benefits prior to October 25, 1999: the "[d]eletion of listing 9.09 does not affect the entitlement or eligibility of individuals receiving benefits because their impairment(s) met or equaled that

listing," and when periodic continuing disability reviews are conducted, the SSA will not find that their disabilities have ended based on a change in the listing. *Id.*

In effect, the Revised Medical Criteria and subsequent Social Security Rulings 00–3p and 02–01p preclude a SSI claimant from a finding of disability based on obesity at Step Three if the claimant filed a claim which was pending initial determination or appeal prior to October 25, 1999.

## (B) Retroactivity

Cherry argues that she had a right to have her SSI claim evaluated under former Listing 9.09 as her application for SSI benefits was filed on May 18, 1999, prior to the effective date of the deletion of the listing. She contends that application of the rule change to claims filed prior to October 25, 1999 amounts to retroactive rulemaking, which the Commissioner lacks authority to do.

The Commissioner asserts that Listing 9.09 does not apply to the evaluation of Cherry's claim as the listing was deleted effective October 25, 1999 and the deletion made applicable to all claims filed before that date and pending initial determination or appeal. Although Cherry filed her application for SSI benefits on May 18, 1999, her claim was pending initial determination on October 25, 1999, the effective date of the deletion of Listing 9.09. The Commissioner contends that application of the rule change to Cherry's pending claim does not have an impermissible "retroactive effect" as does not impair any substantive or vested right possessed by Cherry at the time she acted and it does not alter "the past legal consequences of past actions." The Commissioner, therefore, asserts that the ALJ correctly evaluated Cherry's claim under the revised listings, rather than under former Listing 9.09.

In an unpublished opinion, *Nash v. Apfel*, 215 F.3d 1337, 2000 WL 710491 (10th Cir. June 1, 2000), the Tenth Circuit addressed the issue of whether the Revised Medical Criteria, and therefore the deletion of Listing 9.09, applied to a case pending appeal on October 25, 1999. In *Nash*, the Commissioner argued that the circuit court could not grant the claimant benefits under Listing 9.09 because the listing had been deleted and replaced with more restrictive guidance under the Revised Medical Criteria while the case was on appeal to the Tenth Circuit. Interpreting the statement in the Revised Medical Criteria that the deletion was to have "only a prospective effect" and was not to affect claimants previously found disabled under Listing 9.09, the Commissioner argued that pending claims, including those on judicial review, should be evaluated under the Revised Medical Criteria. The Tenth Circuit rejected the Commissioner's interpretation and position.

■ The *Nash* court found that the presumption against retroactivity in the context of administrative rulemaking precluded the application of the rule change to the pending claim: "A rule changing the law is retroactively applied only if Congress expressly authorized retroactive rulemaking and the agency clearly intended the rule to have retroactive effect." [5] *Id.* at *2 (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)). Citing the Revised Medical Criteria statement that the deletion was to have "only a prospective effect," the Tenth Circuit concluded that the Commissioner had failed to establish that the SSA clearly intended the deletion to be retroactive:

In particular, he has not shown an intention to apply the 1999 deletion retroactively to a claimant who was erroneously denied benefits under the earlier listing, even though a claimant who was granted benefits may continue to receive them. Without a more specific statement of intent, we will not conclude that the agency intended this perverse result.

*Id.*[6] As the *Nash* court found the agency intent prong of the test had not been met, the circuit court did not reach the question of whether Congress had expressly authorized retroactive rulemaking.

The Commissioner contends that *Nash* is called into doubt because the Tenth Circuit did not reference SSR 00–3p. In support, the Commissioner cites the report and recommendation in *Keenan v. Barnhart*, No. CIV–01–835–T (W.D.Okla. Jan. 13, 2003)(adopted by Order dated Feb. 28, 2003)("Keenan R & R") in which the magistrate judge concluded that *Nash* was decided "on the basis that the Commissioner's intent was unclear." *Id.* at 7–8 (attached to defendant's brief). The magistrate judge reasoned that if the Tenth Circuit had the benefit of the SSA's "more specific statement of intent" in SSR 00–3p that the "prospective" effect of the rule change meant that Listing 9.09 was no longer applicable to claims pending initial determination or administrative or judicial appeal before October 25, 1999, the circuit court would have deferred to the SSA's interpretation. *Id.* In other words, the specific statement of the agency's intent the Tenth Circuit found lacking in *Nash* has been addressed in SSR 00–3p.

---

5.  The circuit court noted that a common definition of "retroactive" is "that it extends a statute or ruling 'in scope or effect to matters that have occurred in the past.'" *Nash*, 2000 WL 710491 at *2, n. 1 (quoting *Black's Law Dictionary* 1318 (7th ed.1999)).

6.  Although SSR 00–3p was issued two weeks before the Tenth Circuit's decision in *Nash*, the court made no mention of the ruling.

■ While the Court agrees that SSR 00–3p (and SSR 02–1p) provides a more specific statement of the agency's intent to apply the revised listing to claims filed before October 25, 1999, such is not dispositive. As the *Nash* court recognized, the Commissioner must also establish that "Congress expressly authorized retroactive rulemaking." *Nash*, 215 F.3d 1337, 2000 WL 710491 at *2. There are two criteria for the Court to weigh in determining whether the deletion applies retroactively: (1) whether the SSA expressed its clear intention that the deletion apply retroactively and (2) if so, whether Congress has expressly authorized the SSA to promulgate retroactive rules. *Id.; Portlock v. Barnhart*, 208 F.Supp.2d 451, 461–62 (D.Del.2002). Thus, assuming that the SSA intended "retroactive" application of the rule change, the Commissioner must also establish the agency was expressly authorized to do so.

As noted by the Tenth Circuit, this two-pronged test was adopted by the United States Supreme Court in *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). In *Bowen*, the United States Supreme Court unanimously held that the Department of Health and Human Services ("HHS") lacked authority to promulgate retroactive legislative rules to implement the Medicare Act. In 1981, HHS had issued a cost-limit schedule that altered the method for calculating the "wage index" used by government hospitals to determine the amount that health care providers could be reimbursed for expenses incurred in providing services to Medicare patients. Various hospitals sued to invalidate the new wage-index rule. The United States District Court for the District of Columbia

struck the rule based on HHS's failure to provide proper notice and comment as required by the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq. Id.* at 206–07, 109 S.Ct. 468. Rather than appeal, HHS settled the dispute by applying the pre–1981 wage-index method. In 1984, after providing notice and receiving public comment, HHS re-issued the wage-index rule to recoup sums it had paid the hospitals, adopting the same effective date as the original 1981 rule which had been invalidated.[7] The hospitals challenged the retroactive application of the rule.

In finding the reissued rule was impermissibly retroactive, the Supreme Court adopted the following canon of construction pertaining to administrative rulemaking:

> It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress. In determining the validity of the Secretary's retroactive cost-limit rule, the threshold question is whether the Medicare Act authorizes retroactive rulemaking.

> Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result. . . . By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms. . . . Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to

---

7. "Because Congress had subsequently amended the Medicare Act to require significantly different cost-reimbursement procedures, the readoption of the modified wage- index method was to apply exclusively to a 15–month period commencing July 1, 1981." *Bowen*, 488 U.S. at 207, 109 S.Ct. 468.

find such authority absent an express statutory grant.

*Id.* at 208–09, 109 S.Ct. 468. (citations omitted). The Court then determined that the Medicare Act did not expressly authorize retroactive promulgation of cost-limit rules under the statutory provision authorizing HHS to make retroactive corrective adjustments under 42 U.S.C. § 1395x(v)(1)(A) or under the provisions establishing HHS's general rulemaking power pursuant to 42 U.S.C. §§ 1395hh and 1395ii.[8] *Id.* at 208–215, 109 S.Ct. 468.

In adopting this "clear statement" rule, the *Bowen* Court implicitly assumed that Congress intends through its facially unlimited grants of rulemaking authority to confer agencies with the power to issue only prospective legislative rules. Thus, to overcome this presumption, the agency must establish that Congress expressly provided it with the power to make retroactive rules.

The Commissioner has not cited any specific statute authorizing the SSA to apply a listing change retroactively. *See Portlock,* 208 F.Supp.2d at 462; *Kokal v. Massanari,* 163 F.Supp.2d 1122, 1134 (N.D.Cal.2001).[9] As for the SSA's general rulemaking power, section 405(a) of the Social Security Act grants the Commissioner the authority to "adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order

to establish the right to benefits hereunder." 42 U.S.C. § 405(a). While broad, this grant of authority does not *expressly* provide the SSA with the power for retroactive rulemaking. *See Bowen,* 488 U.S. at 214, n. 3, 109 S.Ct. 468 (concluding that that the statutory grant of general rulemaking authority under 42 U.S.C. § 405(a), incorporated under the Medicare Act in 42 U.S.C. § 1395ii, does not provide statutory authority for retroactive rulemaking); *Portlock,* 208 F.Supp.2d at 462–63; *Kokal,* 163 F.Supp.2d at 1134; *but see Keenan R & R* at 12–13 (limiting *Bowen* to the proposition that the agency's general rulemaking authority was not enough to save a rule requiring private hospitals to refund Medicare payments for services rendered before the effective date of the rule when the new rule conflicted with a specific statute limiting retroactive regulations for cost-reimbursement). The Court, therefore, concludes that the SSA lacks authority to apply the Revised Medical Criteria retroactively to SSI claims.

The Commissioner contends that even if the SSA lacks authority for retroactive rulemaking, its application of the revised listing to Cherry's claim for SSI benefits has no "retroactive effect." The Court disagrees.

■ The Tenth Circuit in *Nash* noted that the common definition of "retroactive" is that it extends a statute or ruling "in scope or effect to matters that have occurred in the past." *Nash,* 215 F.3d 1337,

---

**8.** Section 1395ii incorporates 42 U.S.C. § 405(a) which is the statutory grant of general rulemaking authority to the SSA at issue here. *Id.* at 214, n. 3, 109 S.Ct. 468.

**9.** While there are several cases which have found the deletion of Listing 9.09 to be retroactive to claims pending initial determination and appeal, the Court notes that none of these cases addresses whether the SSA has statutory authority for retroactive rulemaking. *See Stone v. Massanari,* 2001 WL 987852

(S.D.Ind. July 26, 2001); *Havens v.Massanari,* 2001 WL 721661 (D.Kan. May 9, 2001); *Castrejon v. Apfel,* 131 F.Supp.2d 1053, 1056–57 (E.D.Wis.2001); *Cornett v. Massanari,* 2001 WL 34043762 (D.Or. June 22, 2001); *Rodriguez v. Massanari,* 2001 WL 406225 (N.D.Tex.); *Allen v. Apfel,* 2001 WL 253120 (E.D.La. March 14, 2001); *Parent v. Halter,* 153 F.Supp.2d 1090 (W.D.Mo.2001); *Fulbright v. Apfel,* 114 F.Supp.2d 465, 466–67 (W.D.N.C.2000).

2000 WL 710491 at *2, n. 1; *Portlock*, 208 F.Supp.2d at 461. A regulation has a "retroactive effect" if it impairs rights a party possessed at the time she acted, increases a party's liability for past conduct, or imposes new duties with respect to transactions already completed. *Landgraf v. USI Film Products*, 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (finding that Section 102 of the Civil Rights Act of 1991 authorizing compensatory and punitive damages and jury trials in Title VII cases did not retroactively apply to a case pending appeal when the Act was enacted). *Landgraf* instructs that a statute or regulation is not retroactively applied "merely because it is applied in a case arising from conduct antedating the statute's [or regulation's] enactment"; "[r]ather the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at 269–70, 114 S.Ct. 1483. *Daniels v. United States*, 254 F.3d 1180, 1187 (10th Cir. 2001)("[T]he general rule is that courts will not apply [a new] statute in ways that would create new legal consequences for events completed before the statute was enacted."); *Grigsby v. Barnhart*, 294 F.3d 1215, 1219 (10th Cir.2002)(finding "no impermissible retroactivity" in the application of the statutory amendments regarding drug addiction and alcoholism to claims pending administrative process or judicial review as Congress explicitly directed their application to pending claims). "The critical question is whether a challenged rule establishes an interpretation that 'changes the legal landscape.'" *National Mining Assoc. v. Dep't of Labor*, 292 F.3d 849, 859 (D.C.Cir.2002).

> In analyzing each new regulation, we first look to see whether it effects a substantive change from the agency's prior regulation or practice. If a new regulation is substantively consistent with prior regulations or prior agency practices, and has been accepted by all

Courts of Appeals to consider the issue, then its application to pending cases has no retroactive effect. If a new regulation is substantively inconsistent with a prior regulation, or any Court of Appeals decision rejecting a prior regulation or agency practice, it is retroactive as applied to pending claims. . . .

> Such rules change the legal landscape as applied to cases that were pending when the regulations were promulgated. . . . Thus, to the extent that a new rule reflects a substantive change from the position taken by any of the Courts of Appeals and is likely to increase liability, that rule is impermissibly retroactive as applied to pending claims.

*Nat'l Mining*, 292 F.3d at 860.

The Court finds that the deletion of Listing 9.09 resulted in a substantive change in the SSA's determination of disability which attached "new legal consequences" for individuals with claims pending initial determination or administrative or judicial review prior to October 25, 1999; that is, for individuals who "acted" by filing their claims prior to the effective date of the final rule. *Cf. Portlock v. Barnhart*, 208 F.Supp.2d 451, 461 (D.Del.2002)(finding application of revised listing to claim pending judicial review was impermissible retroactive application) *and Kokal v. Massanari*, 163 F.Supp.2d 1122 (N.D.Cal.2001)(same regarding claim pending administrative review) *with Keenan R & R* at 9–12 (no "retroactive effect on a substantive right" of claimant in SSA's application of revised rule to claim pending second administrative appeal). In determining whether a rule change impaired the rights a claimant possessed when she "acted," the "act" of the claimant to be considered is the filing of a claim. *Nat'l Mining*, 292 F.3d at 860 (agreeing with the position that "the relevant date

for purposes of retroactivity is the date the claim is filed").[10]

At the time Cherry filed her claim, Listing 9.09 was in effect. While her claim was pending initial determination, the agency's deletion of the obesity listing and adoption of the revised regulation clearly "raise[d] the bar on proof of disability based on obesity." *Kokal*, 163 F.Supp.2d at 1131; *Portlock*, 208 F.Supp.2d at 461. As noted above, Listing 9.09 provided the claimant with a presumption of disability at Step Three of the evaluation process based on obesity, while the revised listings do not. Under the revised regulation, Cherry was "required to show the extent to which her obesity affects each step of the sequential evaluation process," including its effect on a listed impairment and her residual functional capacity. *Kokal*, 163 F.Supp.2d at 1131. If, however, her claim had been evaluated under the listing in effect at the time she filed her claim, she could have established that she met or equaled the obesity listing, thereby entitling her to a presumption of disability at Step Three of the evaluation process. The Court disagrees with the Commissioner's position that the "regulatory change merely eliminates one unreliable method of determining disability, and does not alter the ultimate standard for evaluating disability claims based on obesity or any other impairment." *Defendant's Brief* (Dkt.# 16) at 7. The elimination of the separate obesity listing clearly alters the standard for evaluating disability claims.

The Court also rejects the Commissioner's argument that Cherry possessed no "substantive right" which was impaired. The Supreme Court emphasized in *Land-graf* that the presumption against retroactivity is not restricted to cases involving contractual or property rights or "vested rights." *Landgraf*, 511 U.S. at 275, n. 29, 114 S.Ct. 1483. Neither *Landgraf* nor *Bowen* limits the presumption against retroactive rulemaking to a claimant's actual loss of benefits. Although "[c]onstitutional restrictions on retroactivity are linked to the prohibitions against both ex post facto laws and takings without just compensation, the contracts clause, and the due process clause," commentators "have long agreed that an analysis of retroactive effect based on the 'vestedness' of the right in question is unpersuasive." William V. Lunberg, *Retroactivity and Administrative Rulemaking*, 1991 Duke L.J. 106, 113, 120 (1991). As is clear from *Bowen* and *Landgraf*, the presumption against retroactivity at issue here is a judicial rule of construction, not a determination of constitutional limits. *But see Keenan R & R* at 9–12 (concluding no "substantive" right affected by the rule change, relying on *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 174, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) ("railway benefits, like social security benefits, are not contractual and may be altered or even eliminated at any time") and *Torres v. Chater*, 125 F.3d 166, 170 (3d Cir.1997)("if a recipient's right to future benefits may be terminated by a statute, it follows that an applicant who has never been declared eligible may as well be deprived of an inchoate right")).

The Court also rejects the Commissioner's argument that the SSA's interpretation of the application of the rule change as "prospective" in the Revised Medical Criteria and as further defined in SSR 00–

---

**10.** The Court agrees with the Magistrate Judge in *Keenan* that it makes no sense to define the "act" as used in *Landgraf* as a claimant becoming obese or disabled. *Keenan R & R* at 11–12. The Court also rejects a possible reading of the "act" as the claimant's receipt of benefits. In the Court's view, the only action taken by the claimant is the filing of the claim, and therefore, the date of filing provides the temporal reference for purposes of the retroactivity analysis.

3p and 02–1p is entitled to deference. The Court agrees that in other contexts Social Security Rulings, though without force of law, are "entitled to deference except when they are plainly erroneous or inconsistent with the [Social Security] Act." *See Walker v. Secretary of Health & Human Services,* 943 F.2d 1257, 1259–60 (10th Cir.1991); *Andrade v. Secretary of Health & Human Services,* 985 F.2d 1045, 1051 (10th Cir. 1993). However, deference to the agency is counterintuitive in this instance as Congress must explicitly grant the SSA authority for retroactive rulemaking and if does not, the court must determine whether the new rule acts to "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483; *Daniels,* 254 F.3d at 1187; *but see Keenan R & R* at 13–16. While deference to the SSA would be appropriate regarding its judgment that Listing 9.09 did not represent a degree of functional limitation that would prevent an individual from engaging in any gainful activity (which is particularly within the agency's area of expertise), whether Congress has explicitly granted the SSA the authority to make the listing change retroactive and whether it is retroactively applied in a case are matters of law for the Court. *See, e.g. Nat'l Mining,* 292 F.3d 849 (not deferring to the Department of Labor ("DOL") in determining whether the DOL's rules promulgated under the Black Lung Benefits Act have an impermissible retroactive effect, but deferring to the DOL's construction of the Act in promulgating the substantive rules). As the Supreme Court in *Landgraf* explained -

The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges tend to have "sound . . . instinct[s] . . . and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance".

*Landgraf,* 511 U.S. at 270, 114 S.Ct. 1483 (citations omitted).

The Court concludes that the SSA's application of the revised listings to Cherry's claim resulted in retroactive rulemaking. Because the Commissioner has failed to establish that Congress expressly authorized the SSA to promulgate a legislative rule which has a retroactive effect, Cherry's claim was improperly evaluated under the revised listings. The Court, therefore, remands the case to evaluate Cherry's claim for SSI benefits under Listing 9.09 which was in effect at the time she filed her claim.

### Conclusion

For the reasons set forth above, the Court concludes that the ALJ erred in failing to apply Listing 9.09 in the evaluation of Cherry's claim. Accordingly, the Court remands the case for further proceedings consistent with this opinion.