**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PEABODY COAL COMPANY,

*Petitioner*,

v.

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS; U.S.
DEPARTMENT OF LABOR; ROBERT
DALE OPP, Deceased,

*Respondents*.

No. 12-70535

BRB No.
10-0463

OPINION

On Petition for Review of an Order of the
Benefits Review Board

Submitted July 11, 2013[*]
Portland, Oregon

Filed April 1, 2014

Before: Harry Pregerson, Mary H. Murguia,
and Morgan Christen, Circuit Judges.

Opinion by Judge Pregerson

---

[*] The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

## SUMMARY[**]

### Black Lung Benefits Act

The panel denied a petition for review of a decision of the Benefits Review Board ordering Peabody Coal Company to pay a coal miner's surviving spouse benefits under the Black Lung Benefits Act of 1972.

The panel held that the administrative law judge did not violate the Administrative Procedure Act by considering the regulatory preamble to the Black Lung Benefits Act in his decision awarding benefits. The panel held that a preamble may be used to give an ALJ understanding of a scientific or medical issue, and concluded that the ALJ properly considered the regulatory preamble to evaluate conflicting expert medical opinions. The panel also held that the ALJ's award of benefits was supported by substantial evidence.

## COUNSEL

Mark E. Solomons and Laura Metcoff Klaus, Greenberg Traurig, LLP, Washington, D.C., for Petitioner.

Jeffrey S. Goldberg, United States Department of Labor, Washington, D.C., for Respondent.

Martin J. Linnet and Jonathan Wilderman, Wilderman and Linnet, P.C., Golden, Colorado, for Respondent.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

# OPINION

PREGERSON, Circuit Judge:

In 2000, Robert Opp ("Opp") filed a disability benefits claim against Peabody Coal Company ("Peabody") under the Black Lung Benefits Act of 1972. 30 U.S.C. § 901(a). Opp, a coal miner for nearly forty years, smoked for over fifty years. In the mid-1990s, Opp began suffering from chronic obstructive pulmonary disease ("COPD"). Opp alleged that his COPD arose out of his employment as a coal miner. When a claimant proves total disability due to either clinical pneumoconiosis or legal pneumoconiosis, the claimant is eligible for benefits under the Black Lung Benefits Act. *See* 20 C.F.R. § 718.201(a). Opp alleged that his condition constituted legal pneumoconiosis and that he was entitled to benefits under the Act.[1]

Following a number of administrative hearings and reviews by the Benefits Review Board, an administrative law judge ("ALJ") ordered Peabody to pay Opp's surviving spouse all the benefits to which Opp was entitled to receive between January 1, 2000, and August 31, 2002. The Benefits Review Board affirmed the ALJ's decision and Peabody Coal petitions for review of that decision. We have jurisdiction to review Peabody's petition pursuant to 33 U.S.C. § 921(c), and we deny the petition.

---

[1] Following Opp's death in 2002, his widow has pursued his claim.

# I.  BACKGROUND

## A.  Factual History

### 1.  The Statute and Regulations

The Black Lung Benefits Act awards benefits to coal miners suffering from pneumoconiosis, defined as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment."  30 U.S.C. § 902(b).  A disease arises out of coal mine employment if it is "significantly related to, or substantially aggravated by, dust exposure in coal mine employment."  20 C.F.R. § 718.201(b).

Before 2001, the Black Lung Benefits Act regulations provided that coal miners suffering from *clinical* pneumoconiosis were eligible for benefits under the Act. 20 C.F.R. § 718.201(a) (2000).  *Clinical* pneumoconiosis refers to a cluster of typically chronic restrictive pulmonary diseases recognized by the medical community as fibrotic reactions to "permanent deposition of substantial amounts of particulate matter in the lungs."  20 C.F.R. § 718.201(a)(1). In 2001, the regulations were amended to clarify that coal miners suffering from *legal* pneumoconiosis may also receive benefits under the Act.  *Legal* pneumoconiosis refers to "any chronic lung disease or impairment," including "chronic restrictive *or* obstructive pulmonary disease arising out of coal mine employment."[2]    20 C.F.R. § 718.201(a)(2)

---

[2] Restrictive lung disease, or interstitial lung disease, makes it difficult to fill the lungs with air, and for the body to get enough oxygen.  National Institutes of Health, *Interstitial Lung Diseases*, MedlinePlus, http://www.nlm.nih.gov/medlineplus/interstitiallungdiseases.html    (last

(emphasis added). Before Opp's death, he suffered from COPD, which he alleged was a form of *legal* pneumoconiosis.

## 2. *The Regulatory Preamble*

The preamble to the 2001 amendments that clarify the regulatory definition of pneumoconiosis explains that the amendments were intended to "conform [the regulatory definition] to the statute," which defines pneumoconiosis broadly. 65 Fed. Reg. at 79937. "The Department [of Labor] . . . received both favorable and unfavorable comments on its proposed revision to the definition of pneumoconiosis." *Id.* During the notice and comment period, several of the unfavorable comments referred to a review of the available medical literature on obstructive lung disease and pulmonary dysfunction in coal miners, written by Dr. Gregory Fino, a Board-certified physician in pulmonary diseases, and Dr. Barbara Bahl, a doctor in nursing and biostatistics. *Id.* at 79938. Dr. Fino's and Dr. Bahl's "review of the literature . . . led them to conclude that virtually all of the articles they reviewed [were] flawed, and that there [was] no evidence of a clinically significant reduction in lung function resulting from coal mine dust exposure." *Id.*

---

updated July 22, 2013). Obstructive lung disease includes three disease processes that make it difficult to empty the lungs of air: (1) chronic bronchitis, (2) emphysema, and (3) asthma. Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 65 Fed. Reg. 79920, 79939 (Dec. 20, 2000); National Institutes of Health, *What is COPD?*, National Heart, Lung, and Blood Institute, http://www.nhlbi.nih.gov/health/health-topics/topics/copd/ (last updated July 31, 2013).

In the preamble, the Department of Labor observed that Dr. Fino's and Dr. Bahl's "opinions [were] not in accord with the prevailing view of the medical community or the substantial weight of the medical and scientific literature." *Id.* at 79939. The preamble addressed several studies in the medical record that "contain overwhelming scientific and medical evidence demonstrating that coal mine dust exposure can cause obstructive lung disease." *Id.* at 79944; *see id.* at 79941–44.

The preamble first evaluated the medical and scientific literature on chronic bronchitis. The Oxman study, for instance, "found a statistically significant association between cumulative dust exposure and decline in lung function." *Id.* at 79939 (citing A.D. Oxman et al., *Occupational Dust Exposure and Chronic Obstructive Pulmonary Disease: A Systematic Overview of the Evidence*, 148 Am. Rev. Respiratory Disease 38 (1993)). The Oxman study likely "underestimates the association between inhalation of coal mine dust and loss of lung function" because unhealthy workers tend to exit the workforce. *Id.* (emphasis omitted). Likewise, the Marine study found that "[e]ven in the absence of smoking, coal mine dust exposure is clearly associated with clinically significant airways obstruction and chronic bronchitis." *Id.* at 77940 (citing W.M. Marine et al., *Clinically Important Respiratory Effects of Dust Exposure and Smoking in British Coal Miners*, 137 Am. Rev. Respiratory Disease 106 (1988)). The Marine study found that "[t]he risk [of airways obstruction resulting from coal mine dust exposure] is additive with cigarette smoking." *Id.* Studies similar to the Marine study, such as the Attfield and Hodous study, "demonstrated a clear relationship between dust exposure and a decline in pulmonary function [in coal miners] of about 5 to 9 milliliters a year." *Id.* (citing M.D.

Attfield & T.K. Hodous, *Pulmonary Function of U.S. Coal Miners Related to Dust Exposure Estimates*, 145 Am. Rev. Respiratory Disease 605 (1992)). According to Attfield and Hodous, the "average decrement for smokers was only 5ml" per pack-year of smoking. *Id.* at 79941 (quoting 145 Am. Rev. Respiratory Disease at 608).

The preamble next evaluated the medical and scientific literature on emphysema. The Cockcroft study found that centrilobular emphysema "was significantly more common among . . . coal workers" and "related to the amount of dust in the lungs." *Id.* (citing A. Cockcroft et al., *Post-mortem Study of Emphysema in Coalworkers and Non-Coalworkers*, 2 Lancet 600 (1982)). The Leigh study found "strong evidence that emphysema in coalworkers is causally related to lung coal content." *Id.* at 79942 (quoting J. Leigh et al., *Quantified Pathology of Emphysema, Pneumoconiosis and Chronic Bronchitis in Coal Workers*, 40 Brit. J. Indus. Med. 258 (1983)). The Ruckley study also found evidence of a causal connection between coal dust exposure and emphysema. *Id.* (citing V.A. Ruckley et al., *Emphysema and Dust Exposure in a Group of Coal Workers*, 129 Am. Rev. Respiratory Disease 528 (1984)). Dr. Fino and Dr. Bahl cited several sources supporting the contention that there is no causal connection between coal dust exposure and emphysema. The preamble noted that Dr. Fino and Dr. Bahl quoted a passage from a textbook on occupational lung disease to support their assertion that focal emphysema cannot be equated with airways obstruction. *Id.* (citing Occupational Lung Diseases (W. Keith C. Morgan & Anthony Seaton eds., (3d ed. 1995))). But the preamble also noted another passage from the same textbook that stated "[t]he increased risk of centriacinar emphysema . . . supports the hypothesis that coal dust exposure sufficient to cause

alveolar inflammation and fibrosis also initiates centriacinar emphysema." *Id.* (quoting Occupational Lung Diseases at 400–401).

### 3. The Relevant Testimony

At his administrative hearing in 2000, Opp testified about his smoking history and coal mine employment. Opp worked as a coal miner for thirty-nine years and smoked between one-half and one and a half packs of cigarettes a day for around fifty-two years. Opp testified that "a lot of times" he quit smoking for "six or seven months at a time." He said that he "[m]ight have only smoked four months some of the[] years," while other years he may have "smoked [for] eight" months.

As a coal miner, Opp worked on the surface of the mine. He operated an end loader during the last fifteen years of his coal mine employment. Opp described his work environment as dusty to "real bad." He said the dust saturated all the way through his clothing to his skin, and that within a half hour of starting work, his clean clothes would be dirty.

In 1989, Opp was forced to retire after he broke his back during a fall from the radiator of a haul truck. Opp underwent surgery for this injury. He testified that his breathing problems were "just starting" when he injured his back.

Two medical experts testified that Opp's respiratory impairment was attributable to his employment as a coal miner. In 2000, the Department of Labor provided for an examination of Opp by physician David James. Opp testified that he told Dr. James that he "had been short of breath" since

1994 or 1995. Dr. James diagnosed Opp with: (1) coal workers' legal pneumoconiosis, attributable to coal dust exposure; (2) COPD, attributable to coal dust exposure and smoking; and, (3) exercise-induced desaturation of oxygen, attributable to pneumoconiosis and COPD. Dr. James concluded that "chronic exposure to coal mine dust [was] a contributing factor to [Opp's] total disability and severe respiratory impairment."

In 2001, Opp's treating physician, William Anderson, prepared a report on Opp's respiratory condition. Dr. Anderson expressed the opinion that Opp was suffering from COPD and concluded that coal dust exposure "most probably [was] a contributing factor . . . due to [Opp's] severe disease at [the] relatively young age [of 68]."

Peabody's four medical experts, who assessed Opp's respiratory impairment between 2000 and 2001, testified that Opp's respiratory impairment was not attributable to his coal mine employment. In 2000, Dr. Lawrence Repsher examined Opp and diagnosed him with COPD unrelated to coal dust exposure. Dr. Repsher concluded that Opp did not have coal workers' pneumoconiosis because he believed that coal dust has primarily restrictive, rather than obstructive effects. At his deposition, Dr. Repsher testified that "the coal mine dust literature"does not provide evidence that coal dust exposure can cause "clinically significant [COPD]" in a miner who never smoked.

In 2001, Dr. Peter Tuteur prepared a report based on Opp's medical record. Dr. Tuteur described Opp's symptoms as "quintessentially characteristic of . . . [COPD]." Dr. Tuteur testified that "[t]here's no credible evidence in the literature to indicate that coal mine dust inhalation acts

additively or synergistically with the chronic inhalation of tobacco smoke to promote [COPD]."

Also in 2001, Dr. Joseph Renn prepared a report based on Opp's medical record. Dr. Renn diagnosed Opp with "chronic bronchitis with an asthmatic component and pulmonary emphysema," all stemming from tobacco smoking rather than exposure to coal mine dust.

Finally, Dr. Fino, in 2001, prepared a report based on Opp's medical record. Dr. Fino diagnosed Opp with bullous emphysema, "a classic pattern that one would expect as a result of cigarette smoking." At his deposition, however, Dr. Fino admitted the possibility of a coal-dust-induced disease "in a susceptible individual."

## B.  Procedural History

During a lengthy procedural process, the ALJ twice awarded and twice denied benefits. The Benefits Review Board remanded the case to the ALJ three times. In its 2009 remand to the ALJ, the Benefits Review Board explicitly permitted the ALJ to review the medical literature in the record to determine whether Dr. James, who believed that Opp's COPD was caused in part by coal dust, "accurately characterized the literature." The Benefits Review Board also permitted the ALJ to consider "whether the criticisms that [Peabody's] experts have raised concerning the studies [that Dr. James relied on] have merit." The ALJ properly construed this to mean that he should assess whether Peabody's experts accurately characterized and critiqued the literature.

In evaluating the merit and accuracy of the medical expert testimony, the ALJ relied, in part, on the regulatory preamble to 20 C.F.R. § 718.201(a), the regulation defining coal workers' pneumoconiosis. *See* 65 Fed. Reg. at 79937–45. The ALJ concluded that Dr. James's and Dr. Anderson's opinions that coal dust exposure contributed to Opp's COPD were well reasoned and documented. The ALJ also concluded that Dr. James accurately characterized the medical literature. In contrast, the ALJ found that Peabody's doctors' opinions should be discounted and accorded diminished evidentiary weight because their negative characterization of the medical literature was not in accord with prevailing medical views, as set forth in the regulatory preamble. The ALJ also found "substantial equivalency" between coal dust conditions in Opp's work on the surface of the mine and "underground coal mine work."

The ALJ concluded that Opp's legal pneumoconiosis arose out of coal mine employment, and that Opp's coal mine employment was "a substantial contributing cause of [Opp's] totally disabling . . . pulmonary impairment." The ALJ ordered Peabody to pay Opp's surviving spouse all the benefits to which Opp was entitled between January 1, 2000, and August 31, 2002. The Benefits Review Board affirmed the ALJ's decision in 2011. Peabody appeals.

## II. ANALYSIS

### A. The ALJ Did Not Violate the Administrative Procedure Act by Considering the Preamble.

Peabody challenges the ALJ's reliance on the regulatory preamble in his decision awarding benefits to Opp. Peabody argues that the ALJ impermissibly gave the regulatory

preamble the force of law in violation of the Administrative Procedure Act. This challenge therefore presents a question of law that we review de novo. *Valladolid v. Pac. Operations Offshore, LLP*, 604 F.3d 1126, 1130 (9th Cir. 2010).

The Black Lung Benefits Act requires that regulations be issued in conformity with 5 U.S.C. § 553 of the Administrative Procedure Act. 30 U.S.C. § 936(a). Pursuant to § 553, regulations may be promulgated following a period of notice and comment. A regulatory preamble, such as the one at issue in this case, is not subject to notice and comment. As a result, the preamble is not legally binding. *See* § 936(a).

In 2002, mine operators, insurance companies, and the National Mining Association (collectively, the "NMA") challenged the legality of the preamble at issue in this case. *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 855 (D.C. Cir. 2002). The NMA was concerned that coal mine workers with lung impairments who also smoked would be presumed eligible for benefits and the preamble would impermissibly be given the force of law. The United Mine Workers of America and other black lung advocates intervened on behalf of the Secretary of Labor, arguing in favor of the regulations and the preamble. *Id.* The D.C. Circuit upheld the regulations in all respects, confirming that the preamble does not diminish the requirement that miners individually demonstrate their lung impairments arose out of coal mining employment: "[T]he preamble itself states that the revised definition [of pneumoconiosis] does not alter the requirement that individual miners must demonstrate that their obstructive lung disease arose out of their work in the mines." *Id.* at 863 (citing 65 Fed. Reg. at 79938).

Here, Peabody argues that (1) Opp has not demonstrated that his COPD arose from coal mine employment, and (2) the ALJ impermissibly relied on the preamble to award benefits. We find, however, that the ALJ simply—and not improperly—considered the regulatory preamble to evaluate conflicting expert medical opinions. The ALJ then evaluated the record to determine that Opp's condition did, in fact, arise from coal mine employment.

A preamble may be used to give an ALJ understanding of a scientific or medical issue. The ALJ's reliance on the regulatory preamble has been explicitly endorsed by various courts of appeal and the Benefits Review Board. *See A & E Coal Co. v. Adams*, 694 F.3d 798, 802 (6th Cir. 2012) (explaining that the preamble "merely explains why the regulations were amended" and did "not expand their reach");[3] *Harman Mining Co. v. Dir., Office of Workers' Comp. Programs*, 678 F.3d 305, 314–15 (4th Cir. 2012) (concluding that "the ALJ was entitled to" look to the preamble to assess a medical expert's credibility); *Helen Mining Co. v. Dir., Office of Workers' Comp. Programs*, 650 F.3d 248, 257 (3d Cir. 2011) (stating "[t]he ALJ's reference to the preamble . . . unquestionably supports the reasonableness of his decision to assign less weight" to a medical expert's opinion); *Consolidation Coal Co. v. Dir., Office of Workers' Comp. Programs*, 521 F.3d 723, 726 (7th Cir. 2008) (describing as "sensible" an ALJ's decision to discredit a medical expert's opinion that was inconsistent with the preamble); *Ethel Groves v. Island Creek Coal Co.*, BRB No. 10-0592, 2011 WL 2781446, at *3 (DOL Ben. Rev. Bd. June 23, 2011) (ruling that "an administrative law judge

---

[3] In *A & E Coal Co.*, the petitioner presented—and the Sixth Circuit rejected—the same argument Peabody presents here.

has the discretion to examine whether a physician's reasoning is consistent with the conclusions contained in medical literature and scientific studies relied upon by [the Department of Labor] in drafting the definition of legal pneumoconiosis").

Peabody relies on *Wyeth v. Levine*, 555 U.S. 555 (2009) and *Home Concrete & Supply, LLC v. United States*, 634 F.3d 249 (4th Cir. 2011) to argue that we should be wary of preambles that rewrite or significantly supplement regulations and statutes. In the case before us, however, the preamble does no such thing. It is consistent with the Black Lung Benefits Act and its regulations. Thus, *Wyeth* and *Home Concrete & Supply* are inapposite.

In *Wyeth*, the drug company Wyeth failed to warn about the consequences of administering a drug through the IV push method. 555 U.S. 555, 559–60 (2009). Wyeth argued that Levine's state law claims were preempted as an obstacle to federal regulation because: (1) the drug's label complied with the Federal Drug Administration ("FDA") regulations, and (2) the 2006 preamble to an FDA regulation declared that state law failure-to-warn claims "threaten the FDA's statutorily prescribed role as the expert Federal agency responsible for evaluating and regulating drugs." *Id.* at 575–76 (internal quotation marks and citation omitted). The contested preamble in *Wyeth* contained an agency's legal interpretation, and not, as in the case before us, a fact-based explanation of the agency's interpretation in light of empirical research. In *Wyeth*, "[w]hen the FDA issued its notice of proposed rulemaking in December 2000, it explained that the rule would not contain policies that have federalism implications or that preempt State law." *Id.* at 577 (internal quotation marks and citation omitted). Thus, the

preamble at issue in *Wyeth* provided a legal interpretation that "reverse[d] the FDA's own longstanding position without providing a reasoned explanation," and this is why the Court ruled that the preamble "[did] not merit deference." *Id*.

Peabody's reliance on *Home Concrete & Supply* is similarly misplaced. *Home Concrete & Supply* discusses the period of time in which the Internal Revenue Service ("IRS") may make certain kinds of tax assessments under 26 U.S.C. § 6501.  634 F.3d 249 (4th Cir. 2011).  In *Home Concrete & Supply*, the IRS argued that, pursuant to the preamble of Treasury Decision 9511, the "six-year period for assessing tax" remained open for "all taxable years . . . that are the subject of any case pending before any court of competent jurisdiction . . . in which a decision had not become final." *Id.* at 256 (internal quotation marks and citation omitted).  In § 6501(a), however, Congress provided that the window for tax assessments closed after three years, barring special circumstances.  Thus, the Fourth Circuit denied force to the preamble at issue in *Home Concrete & Supply* because it contradicted plain statutory language.  634 F.3d at 256–57.

In short, unlike the preambles in *Wyeth* and *Home Concrete & Supply*, the preamble in the case before us is "entirely consistent with the [Black Lung Benefits] Act and its regulations." *Harman Mining Co.*, 678 F.3d at 315 n.4. Like the preamble we addressed in *El Comite Para el Bienestar de Earlimart v. Warmerdam*, the preamble in this case "aid[s] in achieving a general understanding of the statute," 539 F.3d 1062, 1070 (9th Cir. 2008) (internal quotation marks and citation omitted), because it "simply explains the scientific and medical basis for the regulations" that extended the definition of pneumoconiosis, *Harman Mining Co.*, 678 F.3d at 315 n.4.  The preamble discusses the

medical and scientific literature included in the record at the time the Department of Labor amended the regulation defining pneumoconiosis. The evidence supports the conclusion that coal dust exposure contributes to chronic obstructive disease.

Thus, we join our sister circuits in holding that an ALJ may consider the regulatory preamble.

## B. The ALJ's Award of Benefits to Opp is Supported by Substantial Evidence.

Absent error of law, the ALJ's findings and conclusions must be affirmed if supported by substantial evidence. *Palmer Coking Coal Co. v. Dir., Office of Workers' Comp. Programs*, 720 F.2d 1054, 1056 (9th Cir. 1983). Substantial evidence is such evidence that a reasonable mind might accept as adequate to support a conclusion. *Conahan v. Sebelius*, 659 F.3d 1246, 1249 (9th Cir. 2011). "The substantial evidence test for upholding factual findings is 'extremely deferential to the factfinder.'" *Rhine v. Stevedoring Servs. of Am.*, 596 F.3d 1161, 1165 (9th Cir. 2010) (quoting *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 149 (1997)). In weighing medical evidence, "the ALJ is free to credit a witness's testimony in the face of one party's argument that the witness is not credible." *Haw. Stevedores, Inc. v. Ogawa*, 608 F.3d 642, 650 (9th Cir. 2010).

After assessing the expert medical testimony, the ALJ found that Opp's COPD arose out of his coal mine employment. The ALJ rationally credited Dr. James's opinion as well supported and reasoned. Dr. James relied on a number of factors to conclude that Opp's COPD was caused by smoking and coal dust exposure, including: (1) Opp's

medical, smoking, and employment histories; (2) medical literature showing that coal mine dust can cause airflow obstruction in miners whose x-rays do not show evidence of fibrotic disease; (3) the limited reversibility of Opp's condition after use of a bronchodilator; and (4) the unusual severity of Opp's impairment.

The ALJ rationally discounted the testimony of Peabody's medical experts, who based their opinions on the premise that coal dust exposure never, or very rarely, causes COPD. The ALJ permissibly looked to the preamble to determine that Peabody's medical experts proffered only one of several interpretations of the evidence. The ALJ concluded that, in light of the preamble's interpretation of the conflicting medical evidence included in the medical record, Peabody's medical experts' opinions were appropriately afforded less weight. To reverse the ALJ's findings on substantial evidence review in a black lung disability case "we would have to find that [Peabody's medical experts'] interpretation [of the evidence] was the only permissible one." *Midland Coal Co. v. Dir., Office of Workers' Comp. Programs*, 358 F.3d 486, 492 (7th Cir. 2004). Because "there is considerable basic scientific data linking coal mine dust to the development of obstructive airways disease," the ALJ properly discounted the contrary view advanced by Peabody's experts. 65 Fed. Reg. at 79943.

Accordingly, the ALJ's decision to credit Dr. James's and Dr. Anderson's testimony and to afford diminished weight to Peabody's medical experts' testimony is supported by substantial evidence.

## CONCLUSION

Because the agency's award of benefits to Opp is supported by substantial evidence, we deny Peabody's petition for review.

Petition for review **DENIED**.